IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BETH VINCENT INDIVIDUALLY AND AS NEXT OF FRIEND AND GUARDIAN OF CHILD S.J.S.; | ) | |
| *Plaintiffs,* | ) | Civ No. __________________ |
| v. | ) | |
| MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION; ANDA, INC.; HENRY SCHEIN, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; MYLAN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC. (f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., f/k/a JANSSEN PHARMACEUTICA INC.); NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.); WATSON PHARMACEUTICALS, INC. (n/k/a ACTAVIS, INC.); ACTAVIS LLC; ACTAVIS PHARMACEUTICALS, INC. (f/k/a WATSON PHARMACEUTICALS, INC.); ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC; AMNEAL PHARMACEUTICALS, | ) | JURY TRIAL DEMANDED |

LLC; )
AMNEAL PHARMACEUTICALS, INC.; )
ASSERTIO THERAPEUTICS, INC. (f/k/a DEPOMED, INC.); )
ALLERGAN PLC (f/k/a ACTAVIS PLC); )
ALLERGAN FINANCE, LLC (f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC.); )
ALLERGAN SALES, LLC; )
ALLERGAN USA, INC.; )
INDIVIOR, INC.; )
CVS PHARMACY, INC.; )
CVS INDIANA, LLC; )
THE KROGER CO.; )
KROGER LIMITED PARTNERSHIP II; )
RITE AID OF MARYLAND, INC. (d/b/a RITE AID MID-ATLANTIC CUSTOMER SUPPORT CENTER, INC.); )
RITE AID CORP.; )
WALGREENS BOOTS ALLIANCE, INC.; )
WALGREEN EASTERN CO.; )
WALGREEN CO.; )
WAL-MART INC. (f/k/a WALMART STORES, INC.); )
COSTCO WHOLESALE CORPORATION; )
And DOE 1-100, being those persons, firms, corporations, agents, servants and/or employees who authorized, ordered and/or committed the acts described in this Complaint and whose names when ascertained will be substituted by amendment by Plaintiffs, )

*Defendants*. )

## COMPLAINT

**NOW COMES** Plaintiff Beth Vincent individually and as next of friend and guardian of Child S.J.S. and hereby files their Complaint against the Defendants for damages, equitable, statutory, and injunctive relief. In support thereof, Plaintiffs state as follows:

## INTRODUCTION

1. Like thousands of other children born every year, Child S.J.S. too was born dependent on opioids. Prenatal exposure to opioids causes severe withdrawal symptoms and lasting developmental impacts. The first days of her life were spent in excruciating pain as doctors weaned her from opioid addiction. Child S.J.S. will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

2. Child S.J.S. and her family are victims of the opioid crisis that has ravaged the United States, causing immense suffering to those born addicted to opioids and great expense to those forced to deal with the aftermath.

3. At birth, Child S.J.S. was diagnosed with Neonatal Abstinence Syndrome ("NAS"),[1] arising from her mother's dependence, oftentimes an addiction, upon opioids. Upon information and belief, Child S.J.S. was forced to endure a painful start to life: crying excessively, arching her back, refusing to feed, and shaking uncontrollably. NAS is a clinical diagnosis and best described as "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."[2] Upon information and

[1] The term "NAS" is defined to include additional, but medically-symptomatic identical, terminology and diagnostic criteria, including Neonatal Opioid Withdrawal Syndrome (NOWS) and other historically and regionally used medical and/or hospital diagnostic criteria for infants born addicted to opioids from in utero exposure.

[2] Prabhakar Kocherlakota, Neonatal Abstinence Syndrome, 134(2) Pediatrics 547, 547-48 (2014), available at http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

belief, Child S.J.S. spent the first days of life in a Neonatal Intensive Care Unit ("NICU"), writhing in agony as she endured detoxification and withdrawals from powerful opioids. Upon information and belief, Child S.J.S. also underwent Opioid Replacement Therapy to wean her from the involuntary addiction. Such treatment, while medically necessary to save the child's life and lessen her suffering, prolongs the negative health outcomes associated with her respective mother's ingestion of opioids during her pregnancy.

4. Upon information and belief, Child S.J.S.'s mother was prescribed Defendants' opioids prior to her gestation, resulting in the mother's opioid addiction and Child S.J.S.'s opioid exposure during gestation.

5. Child S.J.S.'s mother consumed opioids manufactured, distributed, and sold by one or more of the named defendants.

6. Plaintiff's experiences are part of an opioid epidemic sweeping through the United States that has caused thousands of infants like Child S.J.S. great suffering and continuing developmental issues. This epidemic is the largest health care crisis in U.S. history.

7. At all relevant times, the Defendants manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to accurately represent the benefits and risks associated with the use of the prescription opioid drugs. The net result of this behavior was to flood the market with highly addictive, dangerous opioids, whether through the primary prescription market (including to females of child-bearing age) and the secondary market. At all times, the Defendants have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders. But for the dereliction of this legal duty, the robust secondary market for opioids could not have existed.

## PARTIES

### Plaintiffs

8. Child S.J.S. suffered NAS as a result of exposure to opioids in utero. This drug exposure provides Child S.J.S. the right to sue, through her next of friend and guardian, for equitable and injunctive relief under public nuisance, civil conspiracy, negligence, and gross negligence.

9. Plaintiff Beth Vincent is a resident of Sacramento, Kentucky, in McLean County. Plaintiff is the biological mother and legal guardian of Child S.J.S. who was exposed in utero due to her birth mother's consumption of opioids and born at Baptist Health Madisonville on July 20, 2018. Child S.J.S. was diagnosed with Neonatal Abstinence Syndrome and suffered for ten days in the NICU where her withdrawal symptoms were treated by Opioid Replacement Therapy.

10. Plaintiffs directly and foreseeably sustained all damages alleged herein.

11. Plaintiffs have suffered and continue to suffer these damages directly. Plaintiffs also seek the means to abate the epidemic Defendants' wrongful and/or unlawful conduct have created.

### Defendants

**Distributor Defendants**

12. Defendant McKesson Corporation ("**McKesson**") has its principal place of business located in San Francisco, California and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers nationwide.

13. Defendant Cardinal Health, Inc. ("**Cardinal**") has its principal place of business located in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has

distributed substantial amounts of prescription opioids to providers and retailers nationwide.

14. Defendant AmerisourceBergen Corporation ("**AmerisourceBergen**") has its principal place of business located in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers nationwide.

15. Anda, Inc. ("**Anda**") is a Florida corporation with its principal place of business located in Olive Branch, Mississippi. Anda is the fourth largest distributor of generic pharmaceuticals in the United States. In October 2016, Defendant Teva Pharmaceuticals Industries, Ltd. acquired Anda for $500 million in cash. During all relevant times, Anda distributed prescription opioids throughout the United States.

16. Henry Schein, Inc. ("**Henry Schein**") is in the business of distributing, and redistributing, pharmaceutical products to consumers throughout the United States. In 2015, Henry Schein reported that its sales reached a record $10.4 billion and that it had grown at a compound annual rate of approximately 16% since becoming a public company in 1995. Overall, it is the world's largest provider of health care products and services to office-based dental, animal health, and medical practitioners. Henry Schein distributed prescription opioids throughout the United States.

17. Defendants McKesson, Cardinal, AmerisourceBergen, Anda, and Henry Schein are collectively referred to hereinafter as "**Distributor Defendants**."

**National Retail Pharmacies**

18. Defendant CVS Health Corporation is a Delaware corporation with its principal place of business located in Rhode Island. Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business located in Rhode Island. Defendant, CVS Indiana,

LLC is an Indiana limited liability company with its principal place of business located in Indianapolis, Indiana.

19. Defendants CVS Health Corporation, CVS Pharmacy, Inc. and CVS Indiana, LLC are collectively referred to as "**CVS**."

20. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores in numerous States that sell prescription medicines, including opioids. At all relevant times, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States.

21. Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business located in Illinois. Defendant Walgreens Eastern Co. is a subsidiary of Walgreens Boots Alliance, Inc. that is engaged in the business of distributing pharmaceuticals, including prescription opioids. Defendant Walgreens, Co. is a subsidiary of Walgreens Boots Alliance that operates retail drug stores.

22. Defendants Walgreens Boots Alliance, Inc., Walgreens Eastern Co., and Walgreens Co. are collectively referred to as "**Walgreens**."

23. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Walgreens has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other healthcare facilities.

24. Defendant Wal-Mart Inc. (f/k/a Walmart Stores, Inc.) ("**Wal-Mart**"), is a Delaware corporation with its principal place of business located in Bentonville, Arkansas. Wal-Mart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Wal-Mart distributed prescription opioids and engaged in the

retail selling of opioids throughout the United States.

25. Defendant The Kroger Co. is an Ohio corporation with its principal place of business located in Cincinnati, Ohio. Defendant Kroger Limited Partnership II is an Ohio limited partnership with its principal place of business located in Cincinnati, Ohio.

26. Defendants The Kroger Co. and Kroger Limited Partnership II are collectively referred to as "**Kroger**."

27. Kroger operates 2,268 pharmacies in the United States. At all relevant times, Kroger distributed prescription opioids nationwide.

28. Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., is a Maryland corporation with its principal place of business located in Lutherville Timonium, Maryland. Defendant Rite Aid Corp. is a Delaware corporation with its principal place of business located in Camp Hill, Pennsylvania.

29. Defendants Rite Aid of Maryland, Inc. and Rite Aid Corp. are collectively referred to as "**Rite Aid**."

30. Rite Aid conducts business as a licensed wholesale distributor. Rite-Aid also operates retail stores that sell prescription medicines, including opioids. At all relevant times, Rite Aid distributed prescription opioids and engaged in the retail selling of opioids throughout the United States.

31. Defendant Costco Wholesale Corporation ("**Costco**") is a Washington corporation with its principal place of business located in Issaquah, Washington. At all relevant times. Costco has sold and continues to sell prescription opioids, including the Opioid Drugs at issue in this lawsuit.

32. Defendants CVS, Walgreens, Wal-Mart, Kroger, Rite Aid, and Costco are

collectively referred to hereinafter as the "**National Retail Pharmacies**."

**Pharmaceutical Marketing and Manufacturer Defendants**

**Teva and Associated Entities**

33. Defendant Teva Pharmaceutical Industries, Ltd. ("**Teva Ltd**.") is an Israeli corporation with its principal place of business located in Petah Tikva, Israel. Teva Ltd. is traded on the New York Stock Exchange (NYSE: TEVA). In its most recent Form 10-K filed with the Securities and Exchange Commission, Teva Ltd. stated that it is the leading generic drug company in the United States. Teva Ltd. operates globally, exhibiting significant business transactions in the United States. In 2018, its gross profit from North American operations was $4.979 million.

34. Defendant Cephalon, Inc. ("**Cephalon**") is a Delaware corporation with its principal place of business located in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States. Teva Ltd. acquired Cephalon for $6.2 billion in October 2011, and Cephalon became a wholly-owned subsidiary of Teva Ltd.

35. Defendant Teva Pharmaceuticals USA, Inc. ("**Teva USA**") is a Delaware corporation with its principal place of business located in North Wales, Pennsylvania and is a wholly-owned subsidiary of Teva Ltd.

36. Teva Ltd., Teva USA and Cephalon collaborate to market and sell Cephalon products in the United States. Since its acquisition of Cephalon in October 2011, Teva USA has conducted all sales and marketing activities for Cephalon in the United States, through its "specialty medicines" division. Teva USA and Cephalon work together to manufacture, promote, sell, and distribute opioids such as Actiq and Fentora in the United States. Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. The FDA-approved prescribing information

and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA and directs physicians to contact Teva USA to report adverse events. All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo. Through interrelated operations like these, Teva Ltd. is able to operate nationwide through its subsidiaries. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as a controlling shareholder. The U.S. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015. Teva Ltd.'s year-end report for 2012 — in the year immediately following the Cephalon acquisition — attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including inter alia sales of Fentora. Actiq has been approved by the FDA only for the "management of breakthrough pain in cancer patients 16 years of age and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain." Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay a $425 million fine.

37. Teva USA also sells generic opioids in the United States, including generic opioids previously sold by Allergan plc, whose generics business Teva Ltd., Teva USA's parent company based in Israel, acquired in August 2016.

38. Defendants Teva Ltd., Teva USA, and Cephalon are collectively referred to as "**Teva**."

39. From 2000 forward, Teva has made thousands of payments to physicians nationwide, including in Tennessee and southwest Virginia, ostensibly for activities that include participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance, and other services, many of whom were not oncologists and did not treat cancer pain, but in fact to deceptively promote and maximize the use of opioids.

40. Defendant Watson Pharmaceuticals, Inc. ("**Watson**") is a Nevada corporation with its principal place of business located in Corona, California. On October 31, 2012, Watson announced it had acquired Actavis Group. In January 2013, Watson announced its official name change to Actavis, Inc. Watson is a wholly owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).

41. Defendant Actavis Pharmaceuticals, Inc. (f/k/a Watson Pharmaceuticals, Inc.) ("**Actavis Pharma**") is a Delaware corporation with its principal place of business located in Parsippany, New Jersey and was formerly known as Watson Pharmaceuticals, Inc.

42. Defendant Actavis LLC (f/k/a Actavis Inc., d/b/a Allergan Finance) ("**Actavis LLC**") is a Delaware limited liability company with its principal place of business located in Madison, New Jersey.

43. Defendants Watson, Actavis Pharma and Actavis LLC are collectively referred to as "**Actavis**."

44. Defendant Teva Ltd. acquired ownership of Actavis in August 2016. Prior to that transaction, Actavis was owned by Defendant Allergan plc.

45. Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals,

Inc. on December 30, 2008, and began marketing Kadian in 2009.

46. Actavis made thousands of payments to physicians nationwide ostensibly for activities that include participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

**Janssen and Associated Companies**

47. Defendant Johnson & Johnson ("**J&J**") is a New Jersey corporation with its principal place of business located in New Brunswick, New Jersey.

48. Defendant Janssen Pharmaceuticals, Inc. (f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. which was f/k/a Janssen Pharmaceutica, Inc.) ("**Janssen Pharmaceuticals**") is a Pennsylvania corporation with its principal place of business located in Titusville, New Jersey, and is a wholly owned subsidiary of J&J.

49. Defendant Noramco, Inc. ("**Noramco**") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J had sold its interests to SK Capital. Noramco processed and imported Active Pharmaceutical Ingredients ("**APIs**") necessary for the production of opioid drugs to the United States and sold these APIs to Janssen Pharmaceuticals and various other domestic opioid manufacturers such as J&J.

50. J&J is the only company that owns over 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen Pharmaceuticals' products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and profits inure to J&J's benefit.

51. Janssen Pharmaceuticals, like many other companies, has a corporate code of

conduct which sets forth the organization's mission, values and principles. Its employees are required to read, understand and follow its Code of Conduct for Health Care Compliance. Johnson & Johnson imposes this code of conduct on Janssen Pharmaceuticals as a pharmaceutical subsidiary of J&J. Documents posted on J&J's and Janssen Pharmaceuticals' websites confirm J&J's control of the development and marketing of opioids by Janssen Pharmaceuticals. Janssen Pharmaceuticals' website *"Ethical Code for the Conduct of Research and Development"* names only J&J and does not mention Janssen Pharmaceuticals anywhere within the document. The *"Ethical Code for the Conduct of Research and Development"* posted on the Janssen Pharmaceuticals website is J&J's company-wide Ethical Code, which it requires all of its subsidiaries to follow.

52. The "Every Day Health Care Compliance Code of Conduct" posted on Janssen Pharmaceuticals' website is a J&J company-wide document that describes Janssen Pharmaceuticals as one of the "Pharmaceutical Companies of Johnson & Johnson" and as one of the "Johnson & Johnson Pharmaceutical Affiliates." It governs how lain employees of Johnson & Johnson Pharmaceutical Affiliates, including those of Janssen Pharmaceuticals, "market, sell, promote, research, develop, inform and advertise Johnson & Johnson Pharmaceutical Affiliates' products." All of Janssen Pharmaceuticals' officers, directors, employees, and sales associates must certify that they have "read, understood and will abide by" the code. The code governs all forms of marketing at issue presented in this Complaint.

53. On August 26, 2019, an Oklahoma judge ruled that J&J had intentionally played down the dangers and oversold the benefits of opioids. The judge ordered J&J to pay the state $572 million in the first trial of a drug manufacturer for the destruction wrought by prescription painkillers. The judge found that Oklahoma proved that J&J had created a public nuisance by

exaggerating the benefits of narcotic painkillers and minimizing its addiction risks.

54. Defendants J&J, Janssen Pharmaceuticals, Noramco, Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc are collectively referred to as "**Janssen**."

55. Janssen is or has been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

56. Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic, a fentanyl transdermal patch. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

57. Janssen made thousands of payments to physicians nationwide ostensibly for activities that include participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

**Endo and Associated Companies**

58. Defendant Endo Health Solutions Inc. (f/k/a Endo Pharmaceuticals Holdings Inc.) (“**EHS**”) is a Delaware corporation with its principal place of business located in Malvern, Pennsylvania.

59. Defendant Endo Pharmaceuticals Inc. (“**EPI**”) is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business located in Malvern, Pennsylvania.

60. Defendant Par Pharmaceuticals Companies, Inc. (f/k/a Pharmaceutical Resources, Inc.) is a Delaware corporation with its principal place of business located in Chestnut Ridge, New

York

61. Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is wholly owned subsidiary of Par Pharmaceutical Companies, Inc. (f/k/a Par Pharmaceutical Holdings, Inc.).

62. Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are collectively referred to as "**Par Pharmaceutical**."

63. Defendant Par Pharmaceutical is an affiliate of Defendants EHS and EPI. Par Pharmaceuticals was acquired by Endo International plc in September 2015 and is an operating company of Endo International plc. Endo's combined U.S. Generics segment, which includes Par Pharmaceutical and Qualitest, will be named Par Pharmaceutical, an Endo International Company.

64. Defendants EHS, EPI and Par Pharmaceuticals are collectively referred to as "**Endo**."

65. Endo and their DEA registrant subsidiaries and affiliates are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

66. Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone in the United States. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

67. On June 8, 2017, the FDA requested that Endo remove Opana ER from the market

because of a "serious outbreak" of HIV and hepatitis C due to abuse of the drug after the reformulation of Opana from a nasal spray to an injectable. In response to the FDA's request, Endo removed Opana ER from the market in July 2017, the first time the agency had ever moved to pull an opioid medication from sale.

68. Endo made thousands of payments to physicians nationwide ostensibly for activities that include participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

**Abbott Laboratories**

69. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business located in Abbott Park, Illinois.

70. Defendant Abbott Laboratories, Inc. is a subsidiary of Abbott Laboratories, with is principal place of business located in Abbott Park, Illinois.

71. Defendants Abbott Laboratories and Abbott Laboratories, Inc. are collectively referred to as "**Abbott**."

72. Abbott was primarily engaged in the promotion and distribution of opioids nationwide due to a co-promotional agreement with Purdue. Pursuant to that agreement, between 1996 and 2006, Abbott actively promoted, marketed, and distributed Purdue's opioid products as set forth above.

73. Abbott, as part of the co-promotional agreement, helped turn OxyContin into the largest selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received twenty-five to thirty percent (25-30%) of all net sales for prescriptions written by doctors which its sales force called

on. This agreement was in operation from 1996-2002, following which Abbott continued to receive a residual payment of six percent (6%) of net sales up through at least 2006.

74. With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.

75. Abbott and Purdue's conspiracy with Pharmacy Benefit Managers (PBMs) to drive opioid use is well established. As described in an October 28, 2016, article from Psychology Today entitled *America's Opioid Epidemic:*

> Abbott and Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts] and other pharmacy benefits managers on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction.... One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scene, however, as one Purdue official openly acknowledged, the drug maker was "working with Medco (PBM) [now Express Scripts] to try and make parameters [for prescribing] less stringent.

**Amneal Pharmaceuticals, LLC**

76. Defendant Amneal Pharmaceuticals, LLC ("**Amneal LLC**") is a Delaware limited liability company with its principal place of business located in Bridgewater, New Jersey.

77. Defendant Amneal Pharmaceuticals, Inc. ("**API**") is a Delaware corporation with its principal place of business located in Bridgewater, New Jersey. API is the managing member of Amneal LLC and conducts and exercises full control over all activities of Amneal LLC.

78. Defendants API and Amneal LLC are collectively referred to as "**Amneal**."

79. At all relevant times, Amneal has sold prescription drugs including opioids nationwide.

**Assertio Therapeutics, Inc.**

80. Defendant Assertio Therapeutics, Inc. (f/k/a Depomed, Inc.) ("**Assertio**" or "**Depomed**") is a Delaware corporation with its principal place of business located in Lake Forest, Illinois. Assertio describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Assertio develops, markets, and sells prescription drugs across the United States. Assertio acquired the rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to a January 15, 2015, Asset Purchase Agreement. This agreement closed on April 2, 2015. Assertio has since that date, if not before, sold opioids across the United States.

**Allergan and Associated Companies**

81. Defendant Allergan plc is a public limited company incorporated in Ireland with its principal place of business located in Dublin, Ireland. Its administrative headquarters and all executive officers are located in Madison, New Jersey. Shares of Allergan are traded on the New York Stock Exchange (NYSE: AGN). In its most recent Form 10-K filed with the SEC, Allergan plc stated that it does business in the United States through its U.S. Specialized Therapeutics and U.S. General Medicine segments, which generated nearly 80% of the company's $15.8 billion in net revenue during the year ended December 31, 2018.

82. Before (the entities defined above as) Actavis was sold to Teva Ltd. in August 2016, Actavis was part of the same corporate family as Allergan and sold and marketed opioids as part of a coordinated strategy to sell and market the branded and generic opioids of Allergan and Actavis. In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc., and the combined company changed its name to Actavis, Inc. as of January 2013 and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan plc) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan plc) was

established to facilitate the business combination between Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc became wholly owned subsidiaries of Actavis plc (n/k/a Allergan plc). Pursuant to the transaction, each of Actavis, Inc.'s common shares was converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan plc) was the "successor issuer" to Actavis, Inc. and Warner Chilcott. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc.

83. Defendant Allergan Finance, LLC (f/k/a Actavis, Inc.), f/k/a Watson Pharmaceuticals, Inc.) is a limited liability company incorporated in Nevada and headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly owned subsidiary of defendant Allergan plc. In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC), acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

84. Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California. Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Applications ("ANDAs") for Norco. Allergan Sales, LLC is the wholly owned subsidiary of Allergan plc. The Norco ANDAs are currently held by Allergan Pharmaceuticals International Limited, which is incorporated in Ireland.

85. Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in

Madison, New Jersey. Allergan USA, Inc. is currently responsible for Norco and Kadian sales. Allergan USA, Inc. is a wholly owned subsidiary of Allergan plc.

86. Defendant Allergan plc has, at all times, exercised control over these marketing and sales efforts and profits from the sale of its subsidiaries' products ultimately inure to its benefit, including those sales by Actavis during the period of its ownership and control by Allergan. Allergan and its associated entities are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States, including to Plaintiffs.

87. Defendants Allergan plc, Allergan Finance, LLC, Allergan Sales, LLC and Allergan USA, Inc. are collectively referred to as "**Allergan**."

88. Defendant Depomed, Inc. ("**Depomed**") is a California corporation with its principal place of business located in Newark, California. Depomed describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Depomed develops, markets, and sells prescription drugs nationwide. Depomed acquired the rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to a January 15, 2015 Asset Purchase Agreement. This agreement closed on April 2, 2015.

89. Defendant Indivior, Inc. (f/k/a Reckitt Benckiser Pharmaceuticals, Inc.) ("**Indivior**") is a Delaware domestic corporation with its principal place of business located in Richmond, Virginia. Indivior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug. The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivior, Inc. is a subsidiary of Indivior, PLC, based in the United Kingdom. Indivior, Inc. has manufactured and/or labeled Buprenorphine.

90. Mylan Pharmaceuticals, Inc. ("**Mylan**") is a Delaware corporation with its principal place of business located in Canonsburg, Pennsylvania. Mylan manufactures, promotes, sells, and distributes opioids in the United States.

91. Teva, Janssen, Endo, Abbott, Amneal, Assertio, Allergan, Depomed, Invidor, and Mylan, are collectively referred to hereinafter as the "**Manufacturer Defendants**."

**JURISDICTION AND VENUE**

92. The Plaintiffs bring this civil action in *In Re: National Prescription Opiate Litigation*, MDL 2804, and files directly in the Northern District of Ohio as permitted in Paragraph 6(a) of this Court's Case Management Order No. 1 dated April 11, 2018 (Doc. # 232).

93. Jurisdiction of this Court arises under the laws of the United States 28 U.S.C. § 1331 as the Plaintiffs are bringing a federal cause of action that raises federal question jurisdiction. This Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

94. The U.S. District Court, Western District of Kentucky, has personal jurisdiction over Defendants, each of which has substantial contacts and business dealings throughout by virtue of the distribution, dispensing, and sales of prescription opioids within Kentucky. All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions within Kentucky and consequences and damages related to said wrongful actions, conduct, and omissions.

95. The U.S. District Court, Western District of Kentucky, also has personal jurisdiction over all the Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and the Plaintiffs demonstrate national contacts. Here, the interests of justice require that the Plaintiffs be permitted to bring all members of the nationwide RICO enterprise before the court

in a single trial.

96. Venue is proper in the U.S. District Court, Western District of Kentucky, because many of the Defendants' acts and omissions that gave rise to the causes of action of this Complaint occurred in this judicial district. Plaintiffs state that but for the Order permitting direct filing into the Northern District of Ohio pursuant to Case Management Order No. 1, dated April 11, 2018, Plaintiffs would have filed in the U.S. District Court, Western District of Kentucky.

## BACKGROUND FACTS

97. Opioid means "opium – like" and the term includes all drugs derived in whole or in part from the opium poppy.

98. Opioids or opiates include any of various sedative narcotics containing opium or one or more of its natural or synthetic derivatives.

99. The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly, but when misused or abused, they can cause serious harm, including addiction, overdose, and death.

100. The Controlled Substance Abuse Act ("CSA") defines "opiate" or "opioid" as "any drug or other substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such an addiction-forming or addiction-sustaining ability."

101. Prescription opioids with the highest potential for addiction are categorized under Schedule II of the CSA. They include non-synthetic derivatives of the opium poppy (such as

codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

102. Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

103. However, the past two decades have been characterized by increased abuse and diversion of prescription drugs, including opioid medications, in the United States.

**The Opioid Epidemic**

104. Prescription opioids have now become widespread. Opioids are the most-prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.

105. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.

106. The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older – a total of 12 million people – reported using prescription painkillers non-medically, according to the National Survey on Drug Use and Health.

107. By 2011, the U.S. Department of Health and Human Resources, Centers for Disease

Control and Prevention, ("CDC") declared prescription painkiller overdoses at epidemic levels. Specifically, the CDC reported that the death toll from overdoses of prescription painkillers has more than tripled in the past decade, and more than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

108. Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.

109. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22% over the 52,404 drug deaths recorded the previous year.

110. The former President of the United States declared an opioid and heroin epidemic the same year.

111. The CDC released a report analyzing opioid-related hospital emergency department data between July 2016 and September 2017 and found that nearly two-thirds (66.4%) of drug overdose deaths in 2016 involved prescription opioids, illicit opioids, or both, an increase of 27.7% from 2015.

112. Moreover, the CDC has identified an addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.

113. Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin

use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.

114. The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare." The economic burden of prescription opioid misuse alone is $78.5 billion a year, including costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.

115. The epidemic of prescription pain medicine and heroin deaths is devastating families and communities across the country. Meanwhile, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while billions of dollars of injury are caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

116. The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or contributing to the national, state, and local opioid epidemic.

**Neonatal Abstinence Syndrome**

117. Many of the victims of the opioid epidemic, and certainly some of the most harmed, are babies born with Neonatal Abstinence Syndrome ("NAS"). NAS babies likely experience DNA changes at the cellular level, particularly in the tissues of the brain and nervous system, and suffer lifelong afflictions as a result of maternal use of prescription opioid medications during gestation. These patients often require extensive care because they are likely to experience lifelong mental health problems and disorders, developmental impairment and cognitive defects, and physical health limitations and disorders.

118. Recently, there has been a dramatic increase in the number of fetuses that have been

exposed to opioids. Women are also victims of the opioid epidemic, and health care for opioid exposed mothers and their babies is a major factor in the nation's rising unreimbursed healthcare costs.

119. The number of infants born suffering from this insidious condition is staggering. The incidence of NAS in the United States grew five-fold between 2000 and 2012. Specifically, cases of NAS increased nationally from a rate of 1.2 per 1,000 hospital births per year in 2000 to 5.8 per 1,000, with a total of 21,732 infants diagnosed with NAS by 2012. Currently, the best estimates are that a child with NAS is born as frequently as every 15-25 minutes, depending on the time period referenced.

120. In 2011, the Substance Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused opioids (0.9% used opioid pain relievers and 0.2% used heroin).

121. In 2014, the number of babies born drug-dependent had increased by 500 percent since 2000, and the rates of children being placed in foster care due in part to parental drug abuse had risen — now it is almost one-third of all child removals.

122. Opioid-related cases of NAS are rising at such a rapid pace that cities, counties, and health care systems are unable to keep up logistically.

123. Heroin and other opioid misuse during pregnancy are also associated with increased risks and incidence of placental abruption, preterm labor, maternal obstetric complications, maternal mortality, and fetal death. The opioid crisis caused by Defendants served to fuel an epidemic of heroin use.

124. NAS-diagnosed children are at increased risk for neuropsychological function. The challenges presented to them and their caregivers at birth can be summarized as: "Do they catch up, remain at a disadvantage, or proceed to function even more poorly than their peers over time?"

Unfortunately, research arising from the Opioid Epidemic reveals that all children exposed to opioids and other drugs *in utero* are at a substantially higher risk for lower mental abilities and more signs of attention deficits, and that these effects will persist or worsen through adolescence.

125. Specifically, children diagnosed with NAS exhibit:

a. by age 1: diminished performance on the Psychomotor Development Index, growth retardation, poor fine motor skills, short attention span, diminished intellectual performance;

b. between ages 2-3: significantly lower cognitive abilities, including lower motor development, lower IQ, and poor language development;

c. between ages 3-6: significant detrimental impact on self-regulation, including aggressiveness, hyperactivity, lack of concentration, lack of social inhibition, lower IQs (8-15-point difference), poor language development, and behavioral and school problems; and

d. after 8.5 years: significantly greater difference in cognitive scores than at previous ages, especially in girls.

126. While the specific pathophysiological mechanism of opioid withdrawal in neonates is currently not known, several factors can affect the accumulation of opioids in the fetus. Opiate drugs have low molecular weights, are water-soluble, and are lipophilic substances; hence, they are easily transferable across the placenta to the fetus. The transmission of opioids across the placenta increases as gestation increases and synthetic opiates cross the placenta more easily than semisynthetic opiates. NAS is the end result of the sudden discontinuation of prolonged fetal exposure to opioids.

127. NAS babies' mothers either directly purchase and consume prescription opioids from one or more Defendants in the primary market, or indirectly (but foreseeably) obtain them from other sources in the diversionary or secondary market. Each minor child suffers and faces an increased risk of lifelong mental illness, mental impairment, and loss of mental capacity. The minor child's entire health, use of body and mind, and life, including the minor child's ability to

live, learn and work normally, enjoy relationships with others, and function as a valuable citizen, child, parent, income-earner, and person enjoying life, are at risk of being compromised and permanently impaired.

128. Plaintiffs seek equitable relief in the form of medical monitoring, in order to provide this infant with monitoring of developmental issues confronting them as they mature. The ongoing and robust medical monitoring and medical surveillance of opioid-related NAS-diagnosed children is medically necessary. Further, this is a rapidly transforming field, as multiple members of multiple disciplines and support systems, ranging from medical providers to psychologists to behavioral therapists to childcare providers, come together to research the latent negative health impacts of NAS and the need for medical surveillance, and the release of all Defendants' health studies becomes evident.

129. Neonatal exposure to opioids necessarily results in medical needs that exist throughout the entire period of the adolescent development of the Plaintiff. These needs absolutely exist for any child who had to be weaned from these substances. These needs relate primarily to the well-known adverse effect of opioids on behavioral and regulatory development in exposed children. Every single child diagnosed with opioid-related NAS and weaned from opioids must have a robust medical monitoring, medical surveillance and medical referral in order to maximize his or her future as an adult. This relief will also largely abate the public nuisance created by Defendants' conduct. For this reason, Plaintiffs seek, inter alia, injunctive relief.

130. In a study from Florida, the number of newborns who had NAS and were admitted to the NICU increased by 10-fold from 2005 to 2011. Increases in the incidence of NAS have been reported uniformly across community hospitals, teaching hospitals, and children's hospitals.[3]

---

[3] Prabhakar Kocherlakota, Neonatal Abstinence Syndrome, 134(2) Pediatrics 547, 547-48 (2014), available at

131. The NAS epidemic and its consequences could have been, and should have been, prevented by the Defendants who control the U.S. drug distribution industry and the Defendants who manufacture the prescription opioids. These Defendants have profited greatly by allowing the United States to become flooded with prescription opioids.

132. The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

133. Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

134. Defendants' wrongful conduct has allowed billions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic nationwide. This is characterized as "opioid diversion" and created a secondary market. Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant. As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

135. For years, Defendants and their agents have had the ability to substantially reduce the consequences of opioid diversion, including the dramatic increase in the number of infants

---

http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

born with NAS. All the Defendants in this action share responsibility for perpetuating the epidemic and the exponential increase in the number of infants afflicted with NAS.

136. Defendants have foreseeably caused damages to Plaintiffs including the costs of neo-natal medical care, additional therapeutic, prescription drug purchases and other treatments for NAS afflicted newborns, and counseling and rehabilitation services after birth and into the future. Plaintiffs bring this civil action seeking injunctive relief and any other relief allowed by law against the Defendants that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably damaged, and continues to damage, Plaintiffs.

**DEFENDANTS' MISREPRESENTATION OF THE RISK OF SERIOUS LATENT DISEASE TO THOSE EXPOSED TO OPIOIDS IN UTERO**

137. By definition, the Plaintiffs have sustained an exposure to opioids greater than that expected by members of the general population. As part of the anticipated claims process, Plaintiffs will be required to show medical records evidencing exposure to opioids.

138. Neonatal Abstinence Syndrome ("NAS") is a generalized multi-system disorder that produces a constellation of symptoms in neonates and results from abrupt discontinuation of opioids consumed by the mother during pregnancy at the infant's birth.

139. All infants born to mothers with opioid use disorders are at an elevated risk for developing NAS, and there are no well-defined strategies to prevent NAS from occurring in at-risk infants. Babies exposed in utero to opioids are 40% more likely to have injury than babies not so exposed.

140. Opioids represent a single class of exposures since they all cause their effects at the same receptors which are those that mediate the effects of endogenous opiates.

141. Opioids represent a single class of chemical substances since their molecular

structures are very similar.

142. Opioids have typical pharmacological effects which are common to the group: effects on the brain, the nervous system and the gastrointestinal system.

143. The opioid compounds all act at the same biological receptors and mimic natural peptides which have powerful and wide-ranging activity in living systems. Thus, they can be considered a class of chemical drugs both in terms of their pharmacological dosage activity relationships and also their overall chemical structure. They all produce addiction and dependence and cause withdrawal symptoms on removal. Their activity as modulators of neurological signaling makes them especially dangerous in adults due to rebound effects, but they are also now known to have significant effects on fetal development since they alter the cellular signaling environment.

144. The effect of all opioids is produced through a single common pathway – the opioid receptor. The opioid receptor system is ancient and highly conserved, being present since the time that jawed vertebrates first appeared at least 450 million years ago. Clearly, differences between opioid products and potency exist, but their mode of action via the opioid receptor system remains identical.

145. Fetal development relies on the balanced control of cell proliferation and cell death through apoptosis (otherwise termed 'programmed cell death').

146. It has been demonstrated scientifically that exposure to opiates will increase the rate of apoptotic cell death in developing biological systems. This represents a common mode of action which leads to the large plethora of adverse conditions associated with fetal opioid exposure, including – sub-optimal brain maturation, a form of functional teratogenesis associated with reduced cognitive function.

147. Perturbed apoptosis is also a contributory factor in gross fetal malformations. These include mid-line fusion defects such as cleft palate, spina bifida, and gastroschisis postnatally.

148. Apoptosis is also essential for normal heart development. The heart develops from a single tube into a four-chamber heart through a series of complex foldings. Such foldings are produced by cellular proliferation on one side of a tube accompanied by apoptosis on the other side, the asymmetric growth rates thus producing folding. It is clear to see that the mechanism of altered apoptosis rates leads to malformations.

149. Supportive measures are the standard of care, and pharmacotherapy is often initiated to treat their inability to sleep, lack of weight gain, inadequate caloric intake, extreme irritability, seizures and hypertonicity. If a neonate is treated with an opioid, the drug withdrawal has to be gradually tapered as the infant regains the capacity for self-regulation.

150. Buprenorphine and methadone are the most commonly used agents for Opioid Replacement Therapy.

151. Upon information and belief, the agents used in Opioid Replacement Therapy are manufactured and distributed by the Defendants, thereby creating a revenue stream not only from addicting adults who obtained opioids from the street or through a prescription but also creating a revenue stream for Defendants by treating the babies born addicted to opioids.

152. Although a widely accepted treatment, Opioid Replacement Therapy in neonates is associated with a plethora of negative health impacts including but not limited to reduced brain and somatic growth, intractable nystagmus, altered visual evoked potentials, delayed encephalopathy, respiratory depression, bradycardia, hypotension, urinary retention, reduced gut motility and emesis.

153. Specifically, the widely used Opioid Replacement Therapy agent, Buprenorphine,

has been associated with extremely poor outcomes in children up to the age of 3 to whom the drug was prescribed, including congenital heart disease, urinary collecting system defects, ophthalmic defects and maxillofacial defects.

154. Major risks from prenatal opioid exposure include birth defects, altered brain development and NAS. NAS can cause latent defects to the muscular-skeletal system, the digestive system, the cardio-vascular system and the nervous system.

155. Evidence that opioids behaved as they were predicted to and caused major birth defects appeared in the results of the National Birth Defect Prevention Study published in 2010. The study looked at 17,449 cases and 6,701 controls. Statistically significant effects were found for associations between early pregnancy maternal opioid analgesic treatment and certain birth defects, notably heart defects, anencephaly, cleft palate and spina bifida.

156. Long-term cognitive development is impaired in children born with NAS. Further, those children face a significantly increased risk of mental, speech/language and emotional disorders.

157. Children born with NAS face increased risk of falling prey to the disease of addiction.

158. These known risks create a need in the NAS population for medical monitoring.

159. While much is known about the risks of serious latent disease faced by children born with NAS who underwent Opioid Replacement Therapy, recent animal studies have revealed evidence indicating association with additional negative health outcomes:

a. increased incidence of neural tube defects

b. severe heart defects

c. spina bifida

d. impaired nerve myelination

e. reduced regional brain volumes in the basal ganglia

160. The aforementioned risks of serious latent negative health impacts were published, widely available, but not disclosed, or even mentioned, in the Manufacturer Defendants' marketing materials, package inserts, label warnings, unbranded research, captive advocacy group communications, FDA applications, FDA filings or any other means of communication. This information was also available to the Distributor Defendants.

161. The Defendants purposely misrepresented that there were no teratogenic or mutagenic effects associated with the use of opioids to increase their profits.

162. The Defendants purposely misrepresented the potential of opioids to result in the negative health impacts described above.

## OPIOID MARKETS

163. Defendants' pathways to maximizing profits were constrained by the amount of medically necessary opioids that could be sold through controlled channels. The stark reality Defendants faced in terms of maximizing profits was that they could only sell so many prescription opioids to dying cancer patients. "The logic was simple: While the number of cancer patients was not likely to increase drastically from one year to the next, if a company could expand the indications for use of a particular drug, then it could boost sales exponentially without any real change in the country's health demography." And, without a new and robust primary market, there would be no supply for the secondary "spill-over" diversionary market that they intended.

164. Once exposed, users of the opioids could easily transition into the secondary market, which was necessarily supplied from the primary market, and which Defendants were legally charged with insuring there was no supply for. Soon, the demand from the secondary market was further driving prescriptions written for the primary market.

165. Thus, began the Defendants' quest to open a new primary market for opioid prescriptions: treatment of (a) chronic, (b) widespread pain (c) without dose limits. And, their "ace in the hole" was this: not only could they convince physicians to write prescriptions into this new market, they could ensure through the insidious mechanism of addiction that patients, including women of child-bearing age, would have to keep coming back for more. With the insidious power to create both unlimited supply and unlimited demand for these highly addictive substances, the Manufacturer Defendants set out to create the new primary market. Each of the elements of the new primary market were selected to maximize sales of the highly addictive drugs. Manufacturer Defendants were the architects of the transition from a limited market pool of disease and injury (i.e., cancer, disorders requiring surgery, etc.) to widespread use to treat an ever-enlarging pool of common, non-life threatening, maladies and conditions, such as arthritis, back pain, and joint pain. Thus, the universe of targeted patient conditions could be vastly expanded by Manufacturer Defendants.

166. Next up was the Manufacturer Defendants' successful promotion of highly addictive opioids for chronic pain (i.e., long-term conditions); this step was critical to ensuring that the newly targeted patient conditions would not result in one-time sales.

167. Finally, to ensure even further sales growth and profits, the Manufacturer Defendants promoted the notion that there were no dose limits and, indeed, that patients who appeared to be addicted were actually patients who should be given even more and higher dosages for opioids.

168. In order to maximize profits, the Manufacturer Defendants collectively had to convince physicians to expand treatment of their patients to include chronic and "non-malignant," (i.e., non-cancer) pain. The Manufacturer Defendants also engaged in this activity despite the fact

that the benefits of opioids are minimal in comparison to known risks, which are extreme - even fatal. Prospective, randomized, controlled trials lasting at least four weeks that evaluated the use of opioids for chronic non-cancer-related pain showed only a negligible to modest improvement in pain-relief and no consistent improvement in physical functioning. The maximal adverse risks, however, are a witches' brew known to include a "high incidence of opioid abuse behaviors" and "addiction."

169. The market innovator that "inspired" all other Manufacturer Defendants to follow was Purdue[4], the maker of OxyContin. And, it was not a pharmacological innovation in which it led but yet a marketing innovation.

> i. Arthur Sackler [the founder of Purdue, along with his two younger brothers Mortimer and Raymond] thriv[ed] … in the fledgling field of pharmaceutical advertising. It was here that he would leave his greatest mark. As a member of . . . a small New York-based advertising firm, Sackler expanded the possibilities of medical advertising by promoting products in medical journals and experimenting with televisions and radio marketing. Perhaps his greatest achievement, detailed in his biography in the Medical Advertising Hall of Fame, was finding enough different uses for Valium to turn it into the first drug to hit $100 million in revenue.
>
> ii. Sackler was also among the first medical advertisers to foster relationships with doctors in the hopes of earning extra points for his company's drugs, according to a 2011 expose in *Fortune*. Such backscratching in the hopes of reciprocity is now the model for the whole drug marketing industry.
>
> iii. Starting in 1996, Purdue Pharma expanded its sales department to coincide with the debut of its new drug …. Purdue increased its number of sales representatives from 318 in 1996 to 371 in 2000. By 2001, when OxyContin was hitting its stride, these sales reps received annual bonuses averaging over $70,000, with some bonuses nearing a quarter of a million dollars. In that year, Purdue

[4] A discussion of the Purdue entities is helpful to understanding both the concert of action and unified scheme waged by the entire industry, especially given that Purdue was a "leader" and "early adopter" of so many nefarious activities that were replicated by Defendants. Other persons/entities related to unnamed co-conspirator Purdue include Richard S. Sackler, Jonathon D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, Rhodes Technologies, Rhodes Technologies Inc., Rhodes Pharmaceuticals Inc., Trust for the Benefit of Members of the Raymond Sackler Family, and The P.F. Laboratories, Inc.

> Pharma spent $200 million marketing its golden goose.
>
> iv. Boots on the ground was not the only stratagem employed by Purdue to increase sales for OxyContin. Long before the rise of big data, Purdue was compiling profiles of doctors and their prescribing habits into databases.
>
> v. Between physician databases, incentive-happy sales reps, and an aggressive blitz package of promotional ephemera, Purdue's multifaceted marketing campaign pushed OxyContin out of the niche offices of oncologists and pain specialists and into the primary care bazaar, where prescriptions for the drug could be handed out to millions upon millions of Americans. The most scathing irony is that what allowed OxyContin to reach so many households and communities was the claim that it wasn't dangerous.[5]

170. Concurrent with the innovative marketing techniques of Purdue, were the efforts of the entire industry to secure a highly potent and stable supply of the active pharmaceutical ingredient (API) in opioids. Upon information and belief, Janssen actively conspired with other manufacturer and distributor defendants to significantly increase the supply of powerful opioid drugs in the market, thereby exacerbating the opioid epidemic. In a quest to dominate the growing opioid market, J&J grew poppies in Tasmania, Australia, and imported and sold APIs derived from these poppies necessary for the manufacture of opioid drugs to other manufacturer defendants.

171. The Defendants had an absolute and non-delegable duty to ensure that a supply of controlled substances for a secondary market did not exist. To be clear, the diversion and misuse of controlled substances is a known high-risk factor with significant negative consequences for families, communities, and even entire states. When a manufacturer or distributor who wants to deal in controlled substances registers with the DEA, they must take on a duty to prevent the known negative health effects of their addictive products.

172. In the case of prescription opiates, not only did Defendants wholly fail in that duty,

---

[5] Mike Mariani, "How the American Opiate Epidemic Was Started by One Pharmaceutical Company," Pacific Standard, March 4, 2015.

but they intentionally endeavored to flood the primary market with such an excess of drugs that they either knew, or consciously and willfully disregarded the fact, that this would result in misuse and diversion into a secondary market.

173. Flooding an entire country with this many highly addictive opiates did not occur by accident. Instead, it occurred as the result of a highly coordinated, expensive, misleading, illegal, and callous manipulation of both the sales and distribution schemes for controlled substances within the United States.

## MANUFACTURER DEFENDANTS' WRONGFUL CONDUCT

174. As former U.S. Senator McCaskill aptly recognized:

> The opioid epidemic is the direct result of a calculated marketing and sales strategy developed in the 90's, which delivered three simple messages to physicians. First, that chronic pain was severely undertreated in the United States. Second, that opioids were the best tool to address that pain. And third, that opioids could treat pain without risk of serious addiction. As it turns out, these messages were exaggerations at best and outright lies at worst.

175. To establish and exploit the lucrative market of chronic pain patients, each Manufacturer Defendant developed a well-funded, sophisticated, and fraudulent marketing and distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties, to spread misrepresentations about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were deceptive, false, and unfair. They were not supported by, and in fact contrary to, scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence.

176. The Manufacturer Defendants spread their false, deceptive, and unfair statements by marketing their branded opioids directly to doctors and patients nationwide. In fact, they

specifically targeted susceptible prescribers and vulnerable patient populations. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false, reckless, and/or negligent statements about the risks and benefits of opioids for the treatment of chronic pain.

177. The Manufacturer Defendants' direct and branded advertisements falsely portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. While Endo agreed in 2015-2016 to stop these particularly misleading representations in New York, they continued to disseminate them in elsewhere.

178. The Manufacturer Defendants also promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff and fomented small-group speaker programs. In 2014, for instance, these Defendants spent almost $200 million on "detailing" branded opioids to doctors.

179. Defendants identified doctors who were their most prolific prescribers. However, this was done not to report them, but to market to them. It would make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement.

180. Defendants purchased data from IMS Health (now IQVIA) and other proprietary sources for identify doctors and pill mills to target for marketing and to monitor their own and competitors' sales. Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high-frequency detailing visits. This focus on marketing to the highest prescribers demonstrates that manufacturers were

keenly aware of the doctors who were writing large quantities of opioids. But instead of investigating or reporting those doctors, Defendants were singularly focused on maintaining, capturing, or increasing their sales.

181. Sales representatives making in-person visits to such clinics were likewise not fooled, but as pill mills were lucrative for the manufacturers and individual sales representatives alike, Manufacturer Defendants and their employees turned a collective blind eye, allowing certain clinics to dispense staggering quantities of potent opioids, and reacted feigning surprise when the most egregious examples eventually made the nightly news.

182. The Manufacturer Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are either not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

183. The Manufacturer Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

184. The Manufacturer Defendants' detailing to doctors was highly effective in the

national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

185. The Manufacturer Defendants have had unified marketing plans and strategies from state to state. This unified approach ensures that Defendants' messages were and are consistent and effective across all their marketing efforts.

186. The Manufacturer Defendants negligently marketed opioids through unbranded advertising that promoted opioid use generally yet was silent as to any specific opioid. This advertising was ostensibly created and disseminated by independent third parties but was funded, directed, coordinated, edited, and distributed, in part or whole, by these Defendants and their public relations firms and agents.

187. The Manufacturer Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny as such advertising is not submitted to nor reviewed by the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the negligent messages came from an independent and objective source.

188. The Manufacturer Defendants' negligent unbranded marketing also contradicted their branded materials reviewed by the FDA.

189. The Manufacturer Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to

promote the opioid industry pipeline, from manufacture to distribution to retail.

190. The Manufacturer Defendants also entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Foundation ("APF"), American Academy of Pain ("AAP"), American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), U.S. Pain Foundation ("USPF"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

191. Patient advocacy organizations and professional societies like these play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.

192. The Manufacturer Defendants collaborated, through the aforementioned organizations and groups, to spread false, reckless, and/or negligent messages about the risks and benefits of long-term opioid therapy. The relationships between the Manufacturer Defendants and these groups are further described below:

193. APF was the most prominent member of the seemingly independent groups the Manufacturer Defendants used and was funded almost exclusively by the Manufacturer Defendants, receiving more than $10 million in funding from the Manufacturer Defendants between 2007 and the close of its business in May 2012. APF had multiple contacts and personal relationships with the Manufacturer Defendants through its many publishing and educational programs, funded and supported by the Manufacturer Defendants. On information and belief, between 2009 and 2010, APF received more than 80% of its operating budget from pharmaceutical

industry sources. By 2011, upon information and belief, APF was entirely dependent on incoming grants from Defendants Cephalon, Endo, and others.

194. On information and belief, APF was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Janssen's "Let's Talk Pain." APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients.

195. APF is also credited with creating the PCF in 2004. On information and belief, former APF President Will Rowe described the PCF as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

196. Upon information and belief, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

197. In December 2011, a ProPublica investigation found that in 2010, nearly 90% of APF's funding came from the drug and medical device community, including Manufacturer Defendants. More specifically, APF received approximately $2.3 million from industry sources out of a total income of $2.85 million in 2009. Its budget for 2010 projected receipt of approximately $2.9 million from drug companies, out of a total income of approximately $3.5 million. In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

198. The American Academy of Pain Medicine ("AAPM") was another group that had systematic ties and personal relationships with the Manufacturer Defendants. AAPM's corporate council includes Depomed, Teva and other pharmaceutical companies. AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM described the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allowed drug company executives and marketing staff to meet with AAPM executive committee members in small settings. The Manufacturer Defendants were all members of the council and presented deceptive programs to doctors who attended this annual event.

199. The Manufacturer Defendants internally viewed AAPM as "industry friendly," with Defendants' advisors and speakers among its active members. The Manufacturer Defendants attended AAPM conferences, funded its CMEs and satellite symposia, and distributed its publications. AAPM conferences heavily emphasized sessions on opioids.

200. Upon information and belief, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for AAPM to pursue. AAPM then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

201. APS was another group with systematic connections and interpersonal relationships with the Manufacturer Defendants. APS was one of the groups investigated by Senators Grassley and Baucus, as evidenced by their May 8, 2012 letter arising out of their investigation of "extensive

ties between companies that manufacture and market opioids and non-profit organizations" that "helped created a body of dubious information favoring opioids."

202. Upon information and belief, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APS to pursue. APS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

203. FSMB was another group with systematic connections and interpersonal relationships with the Manufacturer Defendants. In addition to the contributions reported in *Fueling an Epidemic*, a June 8, 2012 letter submitted by FSMB to the Senate Finance Committee disclosed substantial payments from the Manufacturer Defendants beginning in 1997 and continuing through 2012. Not surprisingly, the FSMB was another one of the groups investigated by Senators Grassley and Baucus, as evidenced by their May 8, 2012 letter arising out of their investigation of "extensive ties between companies that manufacture and market opioids and non-profit organizations" that "helped created a body of dubious information favoring opioids."

204. USPF was another group with systematic connections and interpersonal relationships with the Manufacturer Defendants. The USPF was one of the largest recipients of contributions from the Manufacturer Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone. The USPF was also a critical component of the Opioid Marketing Enterprise's lobbying efforts to reduce the limits on over-prescription. USPF advertised its ties to the Manufacturer Defendants, listing opioid manufacturers like Pfizer, Teva, Depomed, Endo, and McNeil (i.e., Janssen) as "Platinum," "Gold," and "Basic" corporate members. Industry groups like AAPM, APS, and PhRMA are also members of varying levels in the USPF.

205. AGS was another group with systematic connections and interpersonal

relationships with the Defendants. AGS was a large recipient of contributions from the Manufacturer Defendants, including Endo and Janssen. AGS contracted with the Manufacturer Defendants to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (The Management of Persistent Pain in Older Persons) and 2009 (Pharmacological Management of Persistent Pain in Older Persons). According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009. AGS internal discussions in August 2009 reveal that it did not want to receive upfront funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.

206. Upon information and belief, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue. AGS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

207. The U.S. Senate found that the Manufacturer Defendants made nearly $9 million worth of contributions to various patient advocacy organizations and professional societies such as those described herein.

208. The Defendants also had systematic links to and personal relationships with each other through their participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities, including but not limited to, the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

209. The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national

news story when it was discovered that lobbyists for members of the PCF, including the Manufacturer Defendants, quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

210. PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.

211. Not surprisingly, each of the Manufacturer Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.

212. In 2012, membership and participating organizations in the PCF included the HDA (of which all the Manufacturer Defendants are members), Endo, Johnson & Johnson (the parent company of Janssen Pharmaceuticals), and Teva (the parent company of Cephalon).

213. AAPM, APF, and APS were also members of the PCF.

214. The HDA is an industry trade association for wholesalers and distributors.

215. The benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."

216. The HDA also offered multiple conferences, including annual business and leadership conferences through which the Manufacturer Defendants had an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."

217. The Defendants met regularly through the PCF and HDA.

218. To convince doctors and patients that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and

helpful. Knowing that they could do so only by misrepresenting the risks and benefits of long-term opioid use to those doctors and patients, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

219. To convince doctors and patients that opioids are safe, the Manufacturer Defendants negligently trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, but they continue to make them today.

220. The Manufacturer Defendants falsely claimed that the risk of opioid addiction is low, and that addiction is unlikely to develop when opioids are prescribed (as opposed to obtained illicitly), and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these misrepresentations by opioid manufacturers are:

a. Actavis employed a patient education brochure that claimed opioid addiction is "less likely if you have never had an addiction problem";

b. Cephalon sponsored APF's Treatment Options: *A Guide for People Living with Pain*, claiming that addiction is rare and limited to extreme cases of unauthorized doses;

c. Endo sponsored a website, Painknowledge.com, which claimed that "[p]eople who take opioids as prescribed usually do not become addicted";

d. Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "most people do not develop an addiction problem";

e. Janssen distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* which described the claim that opioids are addictive as a "myth";

f. A Janssen website claimed that concerns about opioid addiction are "overestimated";

g. Depomed's Senior Vice President and Chief Financial Officer, August Moretti, told investors that "[a]lthough not in the label, there's a very low abuse profile and side effect rate" for Nucynta;

h. Another Endo website, PainAction.com, stated that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them"; and

i. Janssen's unbranded website "Prescribe Responsibly" stated that concerns about addiction were "overestimated" and that "true addiction occurs only in a small percentage of patients."

221. These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including … opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

222. The FDA further exposed the falsity of the Manufacturer Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids in 2013 and for other opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks

of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

223. The Manufacturer Defendants negligently instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox, and Dr. Russell Portenoy, KOLs for Cephalon, Endo, and Janssen. Defendants negligently claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these negligent claims are: (a) Cephalon sponsored Responsible Opioid Prescribing, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated;" and (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain.

224. The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that "[p]atients who do not experience clinically meaningful pain relief early in treatment … are unlikely to experience pain relief with longer-term use," and that physicians should reassess "pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid

use by discontinuing opioids" because the patient is "not receiving a clear benefit."

225. The Manufacturer Defendants recklessly and/or negligently instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Manufacturer Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Manufacturer Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids. Some examples of these claims are: (a) an Endo supplement in the *Journal of Family Practice* emphasized the effectiveness of screening tools to avoid addictions; and (b) Cephalon sponsored a continuing medical education ("CME") presentation offered by Medscape in 2003 entitled Pharmacologic Management of Breakthrough or Incident Pain that taught that "[c]linicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse" and "[t]he concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse."

226. The 2016 CDC Guideline exposes the falsity of these representations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that

doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

227. To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Manufacturer Defendants falsely claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

228. Manufacturer Defendants negligently minimized the significant symptoms of opioid withdrawal – which, as included in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use. The 2016 CDC Guideline recognizes that duration of opioid use and the dosage of opioids should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms" because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high doses because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause [] and restart []" tapers depending on the patient's response. The CDC Guideline also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

229. The Manufacturer Defendants negligently claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences

and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;" (b) Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo pamphlet *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated "The dose can be increased … You won't 'run out' of pain relief;" and (e) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages.

230. These and other representations were not true, as of now confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

231. The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In

2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

232. This court has found that Plaintiffs have presented sufficient evidence to support a finding that each Manufacturer Defendant engaged in misleading marketing activities that resulted in a substantial increase in the supply of prescription opioids and proximately caused harm to Plaintiffs. This court has also found that Plaintiffs in this case have produced evidence upon which a jury could reasonably conclude that each Manufacturer Defendant failed to maintain effective controls against diversion, and that these failures were a substantial factor in producing the harm suffered by Plaintiffs. *See* Opinion and Order denying Janssen's Motion for Summary Judgment, Case 1:17-md-02804-DAP, Doc #2567, Filed 09/04/2019. *See also* Opinion and Order Regarding Defendants' Summary Judgment Motions on Causation, Case 1:17-md-02804-DAP, Doc #2578, Filed 09/09/2019.

233. Manufacturer Defendants' marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

234. Manufacturer Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER negligently claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. The FDA warned in a 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or

intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

235. In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." New York found those statements false and negligent because there was no difference in the ability to extract the narcotic from Opana ER. Similarly, the 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."

236. These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least one year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioid use longer than 12 weeks." Despite this, Defendants negligently and misleadingly touted the benefits of long-term opioid use and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false claims, they continue to make them today.

237. For example, the Manufacturer Defendants falsely and recklessly, and/or

negligently, claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide *Finding Relief: Pain Management for Older Adults* stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreating, having sex, walking, and climbing stairs; (d) *Responsible Opioid Prescribing*, by Cephalon and Endo, taught that relief of pain by opioids, by itself, improved patients' function; (e) Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain, which counseled patients that opioids "give [pain patients] a quality of life we deserve"; (f) Endo's NIPC website painknowledge.com claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse"; (g) Endo CMEs titled Persistent Pain in the Older Patient claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning"; (h) Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function"; and (i) Cephalon's, Endo's, and Janssen's sales representatives conveyed the message that opioids will improve patient function.

238. These claims find no support in the scientific literature. The 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and … complete relief of pain is unlikely. The CDC enforced this conclusion throughout its

2016 Guideline:

a. "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later …";

b. "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improved with long-term opioid therapy"; and

c. "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as lower back pain, headache, or fibromyalgia."

239. The Manufacturer Defendants also negligently and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. For example, APF's *A Policymaker's Guide to Understanding Pain & Its Management,* sponsored by Cephalon, warned that risks of NSAIDs increase if "taken for more than a period of months" and (falsely) attributed 10,000 to 20,000 deaths annually to NSAID overdose, with no corresponding warning for opioids.

240. Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC, based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The 2016 CDC Guideline states that NSAIDS, not opioids, should be the first-line treatment option for chronic pain, particularly arthritis and lower back pain.

241. Each Manufacturer Defendant has fraudulently, recklessly, and negligently marketed its opioids on numerous occasions. In addition to the specific representations and misconduct outlined above, Plaintiffs state the following:

**Cephalon**

242. Cephalon negligently marketed its opioids Actiq and Fentora for chronic pain even though their uses have expressly been limited to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything other than cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

243. Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

a. Cephalon paid CME to have it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009, instructing doctors that "clinically, broad classification of pain syndromes as either cancer or noncancer-related has limited utility," and recommended Actiq and Fentora for patients with chronic pain;

b. Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and

c. In December 2011, Cephalon widely disseminated a journal supplement entitled *Special Report: An Integrated Risk Evaluation and Mitigation*

*Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)* to *Anesthesiology News, Clinical Oncology News,* and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals – that openly promotes Fentora for "multiple causes of pain" and not just cancer pain.

244. Cephalon's marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

245. In summary, Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudo-addiction, even for high-risk patients;

c. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic, non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

d. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including inpatient education materials, concerning the use of opioids to treat chronic, non-cancer pain;

e. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic, non-cancer pain;

f. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

g. Directing its marketing of Cephalon's rapid-onset opioids to a wide range of medical providers, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

h. Making deceptive statements concerning the use of Cephalon's opioids to treat chronic, non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

i. Making deceptive statements concerning the use of opioids to treat chronic

non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

**Actavis**

246. Nationwide, Actavis is engaged in the manufacture, promotion, distribution, and sale of opioids such as the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana.

247. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

248. Actavis negligently promoted Kadian through its detailers and direct-to-physician marketing. In 2010, an FDA-mandated "Dear Doctor" letter required Actavis to inform doctors that "Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

249. The FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effects of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience … results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."

250. In summary, Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b. Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life;

c. Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life while concealing contrary data.

**Depomed**

251. Depomed sales representatives misrepresented the safety and efficacy of its opioid drugs to physicians. Depomed has, since at least October 2011, engaged in unsafe and/or unapproved marketing of Lazanda and (with the acquisition from Janssen in January 2015) of Nucynta and Nucynta ER.

252. Depomed sales representatives promoted Lazanda for unsafe and unapproved uses.

253. Lazanda is only indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving, and who are tolerant to, opioid therapy for their underlying persistent cancer pain." Despite the drug's explicit limitation, Depomed actively promoted Lazanda to physicians who do not treat cancer patients. Not only did Depomed instruct sales representatives to promote Lazanda to non-cancer treating physicians, the Company also discouraged sales representatives from marketing the drug to physicians treating cancer patients, even if the sales representatives were successful in gaining these doctors' business.

254. When it launched Lazanda in 2011, the Company's management, from the start, disregarded the FDA's limitations concerning Lazanda's usage, instructing its sales representatives to target pain management physicians, particularly those who historically wrote large numbers of ROOs and Lazanda-like drugs.

255. Sales representatives were pressured to target pain management physicians. Area

managers at Depomed regularly supplied sales representatives with lists of target physicians containing few, if any, physicians treating cancer patients. Of the typical call list containing approximately 100 physicians, under five generally treated cancer patients.

256. Depomed also strongly discouraged sales representatives from targeting physicians treating cancer patients. Sales representatives had to "make a case" for using any portion of their allotted marketing money to call on cancer treating physicians. And employees who did call on cancer treating physicians were disciplined.

257. One Depomed sales representative, who worked in the Los Angeles area, was chastised by management for targeting, almost exclusively, physicians treating cancer patients despite the fact that he had been very successful in generating business from these physicians. This representative was reprimanded for targeting physicians who could prescribe Lazanda for its indicated use, was told to stop targeting these physicians, and was told to think about how well he could be doing if he was targeting potentially higher writers. Depomed explicitly told sales representatives to market only to non-cancer treating physicians by their managers, most notably Todd Wittenbach, the company's then head of sales for the United States.

258. Depomed sales representatives were also trained to deal with (rightful) pushback from physicians. For example, when confronted with the common statement from a physician that "it's extremely rare that we see cancer patients," Depomed trained sales representatives to divert the conversation to the physician's use of other, similar medications. For example, sales representatives were trained to respond by saying, "well tell me about your patients taking Actiq," and then extol the relative benefits of switching those patients to Lazanda.

259. Due to the worsening headwinds within the opioid market, Depomed ultimately sold Lazanda to Slán Medicinal Holdings on November 7, 2017.

260. Depomed sales representatives promoted Nucynta and Nucynta ER for unsafe and unapproved uses.

261. On April 2, 2015, Depomed acquired from Janssen and its affiliates the U.S. rights to the Nucynta franchise of pharmaceutical products for $1.05 billion in cash. The Nucynta franchise is an opioid that includes Nucynta ER (tapentadol) extended-release tablets indicated for the management of pain, including neuropathic pain associated with diabetic peripheral neuropathy (DPN), severe enough to require daily, around-the-clock, long-term opioid treatment, Nucynta IR (tapentadol), an immediate release version of tapentadol, for management of moderate to severe acute pain in adults, and Nucynta (tapentadol) oral solution, an approved oral form of tapentadol that has not been commercialized.

262. Nucynta's annual sales increased in the U.S. from $189.9 million in 2015 to approximately $281.3 million in 2016, quickly becoming Depomed's best-selling product. This marked a 48% year-over-year growth in sales of Nucynta in just one year.

263. The marketing strategy causing the astronomical growth in sales, however, was fueled by Depomed's illegal practices in connection with its marketing of Nucynta for unsafe and unapproved uses. In particular, Depomed promoted the use of opioids for all manners of pain management while downplaying the drug's addictive nature, often promoting the drug as a safer alternative to opioids, despite this not being on the FDA label.

264. Further, Depomed promoted an increase in dosage while focusing on family physicians and internal medicine doctors who were less knowledgeable about the dangers of opioids. In February 2017, Depomed's former CEO increased its sales force for the specific purpose of targeting primary care physicians.

265. Depomed's marketing push was "Think Differently." Sales representatives were

told that Nucynta is a "safer opioid." They were told to tell physicians about Nucynta and its value to patients in terms of, among other things, improved safety relative to other opioids on the market.

266. Depomed actively targeted primary care physicians with marketing presentations that described Nucynta as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have approval to market Nucynta in this manner nor have any independent scientific evidence to support these claims.

267. The FDA-approved labels for both Nucynta IR and Nucynta ER describe the tapentadol molecule as "a substance with a high potential for abuse similar to other opioids including fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, and oxymorphone." Nowhere on the approved label does it say or mention that Nucynta is safer, more tolerable, less abusive, or less addictive than other opioids. Despite this, Nucynta has a long history of its manufacturer (formerly Janssen) claiming these benefits in its sales pitches and marketing.

268. Nonetheless, Depomed directed its sales representatives to market Nucynta for unsafe and unapproved uses as a safer, less abusive, and less addictive opioid that did not create the same euphoric feeling as other opioids, even though this was not on the FDA-approved label.

269. Depomed management knew that the FDA-approved label for Nucynta contained no information about it being safer, more tolerable, less addictive, or less abusive than alternative opioids, and they knew that they could not market Nucynta this way.

270. On a June 23, 2015, investor call August Moretti, Depomed's Senior Vice President and Chief Financial Officer, stated that "[a]lthough not in the label, there's a very low abuse profile and side effect rate."

271. Additionally, in a March 14, 2015 presentation at the ROTH Conference, then Depomed CEO Schoeneck stated: "The addiction profile is thought to be better. I can't make a

claim around that because we don't actually have that in the label." In February 2017, Schoeneck also told investors that Depomed was "initiating label enhancement studies, aimed at further differentiating Nucynta by highlighting its respiratory depression and abuse potential profile. These labeling studies will focus on the properties of the tapentadol molecule and its uniqueness in the pain marketplace." The purpose of this was to "be able to get it hopefully into the label."

272. Depomed represented that Nucynta was uniquely positioned to combat the negative public sentiment against opioids. Former President and CEO James Schoeneck described to investors that Nucynta had "different properties than the other opioids, particularly when it comes to the kind of activity that the CDC and others are most concerned about" and that "there'll be relatively little impact on [Depomed] compared to where some other companies may fall in at."

273. Depomed knew that it could not promote Nucynta as a safer, less addictive, less abusive opioid that did not have the same euphoric feeling on patients because these properties were not on its FDA-approved label. Despite this knowledge, Depomed trained its sales representatives to use these marketing tactics to sell Nucynta, using the same sales team as Janssen had to promote Nucynta, knowing that Janssen was being sued for, among other things, improperly marketing Nucynta.

274. Due to the worsening headwinds within the Opioid market, Depomed ultimately entered into a commercialization agreement with Collegium Pharmaceutical, Inc., for the NUCYNTA brand on December 4, 2017.

**Endo**

275. Endo develops, markets, and sells prescription drugs, including the branded opioids Opana/Opana ER, Percodan, Percocet, and Zydone and generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States.

276. Endo misrepresented the benefits of opioids for chronic pain. In addition to the numerous examples of such misrepresentations outlined above, Endo distributed and made available on its website www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

277. A CME sponsored by Endo, entitled Persistent Pain in the Older Adult, also claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days.

278. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend beyond New York.

279. In summary, Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic, non-cancer pain;

c. Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d. Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e. Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudo-addiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including inpatient education materials, concerning the use of opioids to treat chronic, non-cancer pain;

h. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain and misrepresented the risks of opioid addiction in this population;

i. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic, non-cancer pain;

j. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life, while concealing contrary data;

k. Directly distributing and assisting in the dissemination of literature that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain, including the concept of pseudo-addiction;

l. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic, non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

m. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

**Johnson & Johnson Defendants**

280. Since at least the mid-1990s, the Johnson & Johnson Defendants (hereinafter referred to "**J&J**"), Johnson & Johnson, Janssen and Noramco, developed, produced, marketed, promoted, and sold opioid drugs and the ingredients for opioid drugs across the nation. Although changes in corporate structure and ownership evolved during the Opioid Crisis, the Johnson & Johnson Defendants independently and in concert contributed to the public nuisance created by their tortious acts.

281. Noramco was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital. All allegations pertaining to J&J also apply to Noramco. Moreover, Noramco is a Pharmaceutical Defendant, and all allegations against the Manufacturer Defendants herein apply equally to Noramco.

282. Janssen is a wholly owned subsidiary of J&J and its manufacturer of opioid drugs. All allegations pertaining to J&J also apply to Janssen. Moreover, Janssen is a Pharmaceutical Defendant, and all allegations against the Manufacturer Defendants herein apply equally to Janssen.

283. In addition to the numerous specific allegations outlined above, Janssen disseminated deceptive statements and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c. Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudo-addiction through internet sites over which Janssen exercised final editorial control and approval;

d. Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e. Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

f. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain and misrepresented the risks of opioid addiction in this population;

g. Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and making false statements that opioids are safe and effective for the long-term treatment of chronic, non-cancer pain and improve quality of life, while concealing contrary data;

h. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic, non-cancer pain;

i. Directly distributing and assisting in the dissemination of literature written that contained deceptive statements concerning the use of opioids to treat chronic, non- cancer pain, including the concept of pseudo-addiction;

j. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic, non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

k. Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic, non-cancer pain; and

l. Making deceptive statements concerning the use of opioids to treat chronic, non-cancer pain to prescribers through in-person detailing.

284. Moreover, as part of its marketing, promotion, and sale of opioid drugs, J&J specifically manufactured and sold opioid drugs through Janssen as part of its pain franchise,

including (i) Duragesic transdermal patch made out of the active pharmaceutical ingredient ("API") fentanyl; (ii) Ultram and Ultram Extended Release ("ER") tablets made out of the APIs tramadol and acetaminophen; (iii) Ultracet – tablets made out of the APIs, tramadol and acetaminophen; (iv) Nucynta and Nucynta ER – tablets made out of the API and tapentadol; (v) Tylenol with Codeine-tablets made out of the APIs, acetaminophen and codeine; (vi) Tylox-capsules made out of the APIs acetaminophen and oxycodone.

285. Dr. Paul Janssen, the founder of Janssen Pharmaceutica, now a subsidiary of J&J, originally invented fentanyl in the 1950s. Fentanyl, an extremely powerful opioid, is a major factor in the opioid crisis, related to rising numbers of overdose deaths as well as the increasing prevalence of NAS.

286. Janssen's opioid marketing, in its multitude of forms, was false, deceptive, and misleading. These marketing activities targeted both the public at large as well as physicians and the medical community directly.

287. Additionally, misinformation from Janssen's direct marketing to doctors influenced the medical community's prescribing practices and perception of the dangers of opioids and encouraged doctors to liberally and aggressively write a higher number of opioid prescriptions. The rapid increase in the prescribing and sale of opioid drugs is directly and causally linked to negative consequences of the opioid epidemic, including addiction and overdose deaths as well as rising rates of NAS and children entering the child welfare system.

288. Upon information and belief, Janssen actively conspired with other pharmaceutical manufacturer and distributor defendants to significantly increase the supply of powerful opioid drugs in the market, thereby exacerbating the opioid epidemic.

289. In a quest to dominate the growing opioid market, J&J grew poppies in Tasmania,

Australia and imported and sold APIs derived from these poppies necessary for the manufacture of opioid drugs to other manufacturer defendants.

290. Beginning in 1990 and continuing until at least 2016, J&J wholly owned two subsidiaries, Noramco and Tasmanian Alkaloids Limited ("Tasmanian Alkaloids"), which supplied opioid manufacturers with the raw ingredients necessary to meet the growing demand for powerful opioid drugs as the opioid epidemic increased in severity.

291. As the opioid crisis worsened, Tasmanian Alkaloids engaged in the cultivation, breeding, and processing of opium poppy plants into compounds necessary for the production of opioid APIs in Tasmania. These raw ingredients were then imported to the United States by Noramco.

292. Noramco imported the raw ingredients produced by Tasmanian Alkaloids to the United States, processed the raw ingredients into opioid APIs, and sold these APIs to opioid manufacturers.

293. Upon information and belief, Johnson & Johnson's activities in the production of raw opioid APIs included the development of the Norman Poppy, a strain of the plant containing high levels of the compound Thebaine, which is a critical ingredient for the production of oxycodone, oxymorphone, nalbuphine, naloxone, naltrexone, and buprenorphine.

294. Upon information and belief, the high-Thebaine Norman Poppy was patented by Tasmanian Alkaloids in 1994 and "was a transformational technology that enabled the growth of oxycodone."

295. Upon information and belief, Noramco sold opioid APIs to various other opioid manufacturers, including Teva and "all seven of the top US generic companies" through "long-term agreements."

296. Upon information and belief, by 2016, when J&J transferred Noramco and Tasmanian Alkaloids to a private investment firm, Noramco was one of the nation's top suppliers of opioid APIs. In a 2015 presentation to potential buyers of the company, Noramco was described to potential buyers as the "#1 supplier of Narcotic APIs in the United States, the world's largest market." The same presentation lists Net Trade Sales for several of Noramco's APIs, including $94 million in Oxycodone and $52 million in hydrocodone in 2014 alone.

297. Upon information and belief, J&J's supplying of raw opioid ingredients enabled manufacturer defendants to meet the growing demand for powerful and dangerous opioid drugs formed in the wake of the pharmaceutical industry's misleading mass marketing of opioid drugs to the medical community and directly to the public. By enabling the large-scale manufacture of these drugs, J&J conspired to create an opioid epidemic, addicting millions of Americans to opioid drugs and significantly increasing instances of NAS in the U.S.

**Par Pharmaceutical**

298. Par Pharmaceutical is an affiliate of Endo, which manufactures opioids sold throughout the United States. All allegations pertaining to Endo also apply to Par Pharmaceutical. Moreover, Par Pharmaceutical is a Manufacturer Defendant, and all allegations against the Manufacturer Defendants herein apply equally to Par Pharmaceutical.

**Indivior**

299. Indivior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug. The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivior has manufactured and/or labeled Buprenorphine. Indivior is a Manufacturer Defendant, and all allegations against the Manufacturer Defendants herein apply equally to Indivior.

300. As demonstrated by the allegations above, the Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers.

301. The Manufacturer Defendants' fraudulent, reckless, and negligent marketing scheme caused and continues to cause doctors to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent these Defendants' negligent marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

302. The Manufacturer Defendants' fraudulent, reckless, and negligent marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their negligent marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

303. The escalating number of opioid prescriptions written by doctors who were deceived by the Manufacturer Defendants' marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the United States. In August 2016, the U.S. Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to negligent marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

304. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

305. Contrary to the Manufacturer Defendants' misrepresentations, most opioid addiction begins with legitimately prescribed opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives opposed to pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

306. The Manufacturer Defendants also failed to prevent diversion of the drugs they manufactured, and to monitor, report, and prevent suspicious orders of prescription opioids in

accordance with federal law.

307. Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

308. Moreover, at all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their negligent marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturer Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like professional societies and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

309. The Manufacturer Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Janssen, ran similar websites that masked their own direct role.

310. Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

311. Thus, the Manufacturer Defendants successfully concealed from the medical community and patients facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. Plaintiffs did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## DISTRIBUTOR DEFENDANTS' WRONGFUL CONDUCT

312. The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90% of all revenues from drug distribution in the United States – an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients.

313. Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain.

314. For example, at the wholesale level of distribution, diversion occurs whenever

distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

315. Diversion occurs through the use of stolen or forged prescriptions at pharmacies or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

316. Opioid diversion occurs in the United States at an alarming rate. In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

317. Every year, thousands of people misuse and abuse opioid pain relievers that can lead to addiction, NAS, overdose and death.

318. Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

319. The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study revealed that 75% of those who began their opioid abuse in the 2000s started with prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

320. Plaintiffs have been significantly damaged by the effects of the Distributor

Defendants' opioid diversion.

321. Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

322. In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the CSA, 21 U.S.C § 801 et. seq. and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion. The Distributor Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violation of these requirements show that they have acted in total reckless disregard.

323. The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

324. Accordingly, the CSA acts as a system of checks and balances from the marketing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

325. All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

326. To prevent unauthorized uses from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances to illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

327. Acquisition and distribution transaction reports must prove data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827 (d) (I); 21 C.F.R. §§ 1304.33 (e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day

of discovery of such loss or theft.

328. In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827 (a)(3), 1304.21 (a), 1034.22 (b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

329. To maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 C.F.R § 1301.71.

330. For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain and have committed repeated violations of the state laws and laws and regulations of the United States as cited above.

331. To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions. Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were given case

studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

332. Since 2007, the DEA has hosted no less than five conferences to provide opioid distributors with updated information about diversion trends. The Defendant Distributors attended at least one of these conferences, which allowed for questions and discussions. The DEA has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association, now the HDMA. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.

333. On September 27, 2006 and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors, including the Distributor Defendants, providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

334. The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling. It also described circumstances that could be indicative of diversion, including ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; disproportionate ratio of ordering controlled substances versus non-

controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to make a determination if the order is indeed suspicious.

335. On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants, including the Distributor Defendants, providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The letter reminded registrants that suspicious orders must be reported when discovered, and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility. Finally, the letter directed the registrant community to review a recent DEA action that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against diversion.

336. The HDMA, the Distributor Defendants' own industry group, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

337. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

338. Opioid distributors have admitted to the magnitude of the problem and, at least

superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

339. For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity" (emphasis added).

340. McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

341. These assurances of identifying and eliminating criminal activity and curbing the opioid epidemic, on their face, create a duty for the Distributor Defendants to take reasonable measures to do just that.

342. In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

343. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies, including actions by the DEA related to violations of the CSA.

344. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States. In 2012, Cardinal reached

an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. In December 2016, a Department of Justice press release announced a multi-million-dollar settlement with Cardinal. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

345. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion. McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that one of its facilities in Colorado between 2008 and 2013 filled more than 1.6 million orders for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer. In 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

346. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents

in connection with a grand jury proceeding to seek information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

347. Relying on state laws and regulations, various state boards of pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

348. Although distributors, including some Distributor Defendants, have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

349. The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to Plaintiffs.

350. The Distributor Defendants have supplied massive quantities of prescription opioids with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

351. Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed into domestic distribution was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

352. The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for

example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

353. On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients and citizens to perform due diligence inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

354. On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing patients and citizens, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

355. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market with highly addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

356. It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including neo-natal addiction and NAS.

357. The Distributor Defendants knew or should have known that the opioids being

diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

358. The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients and citizens were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third parties, and Plaintiffs.

359. The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas – and in such quantities, and with such frequency – that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

360. The Distributor Defendants could and should have taken action that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended-release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

361. Having knowledge and/or notice of the damages that their conduct had caused to Plaintiffs, the Distributor Defendants failed to take other steps to help curb the damages already incurred by Plaintiffs. The Distributor Defendants could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or

otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

362. The Distributor Defendants could have and should have implemented these measures at any point in the last 20 years.

363. If any of the Distributor Defendants adhered to effective controls to guard against diversion, Plaintiffs would have avoided significant damages.

364. The failure to act was negligent and did result in significant damages to Plaintiffs.

365. The Distributor Defendants made substantial profits over the years based on the diversion of opioids. Their participation and cooperation in a common enterprise has foreseeably caused damages to Plaintiffs. The Distributor Defendants knew full well that Plaintiffs would be unjustly forced to bear these injuries and damages.

366. The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for Plaintiffs. Their conduct poses a continuing economic threat to the communities that must deal with ongoing needs of children afflicted with NAS.

## NATIONAL RETAIL PHARMACIES DEFENDANTS' WRONGFUL CONDUCT

367. National retail pharmacy chains earned enormous profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

368. Each of the National Retail Pharmacies does substantial business throughout the United States. This business includes the distribution and dispensing of prescription opioids.

369. Data shows that the National Retail Pharmacies distributed and dispensed substantial quantities of prescription opioids, including fentanyl, hydrocodone, and oxycodone. In addition, they distributed and dispensed substantial quantities of prescription opioids that were ultimately diverted. Despite their knowledge and substantial contribution to the diversion problem, National Retail Pharmacies failed to take meaningful action to stop this diversion.

370. The National Retail Pharmacies developed and maintained extensive data on opioids they distributed and dispensed. Through this data, National Retail Pharmacies had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country. They used the data to evaluate their own sales activities and workforce. On information and belief, the National Retail Pharmacies also provided Defendants with data regarding, inter alia, individual doctors in exchange for rebates or other forms of consideration. The National Retail Pharmacies' data is a valuable resource that they could have used to help stop diversion but failed to do so.

371. Each participant in the supply chain of opioid distribution, including the National Retail Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

372. The National Retail Pharmacies, like manufacturers and other distributors, are registrants under the appropriate state uniform controlled substances act. Because pharmacies themselves are registrants under those acts, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

373. The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

374. Suspicious pharmacy orders include orders unusually large in size — orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration, among others.

375. Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

376. Suspicious pharmacy orders are red flags for, if not direct evidence of, diversion.

377. Other signs of diversion can be observed through data gathered, consolidated and

analyzed by the National Retail Pharmacies themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious of oversupply in particular stores or geographic areas or of prescribers or facilities that seem to engage in improper prescribing.

378. According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

379. Despite their legal obligations as registrants under state law, the National Retail Pharmacies allowed widespread diversion to occur — and they did so knowingly. They knew they made more money by filling prescriptions than by not filling prescriptions; They knew they made more money by making it easy for doctors to refer patients with drug prescriptions to them to fill than by making it difficult for doctors to refer patients to them to fill prescriptions.

380. Performance metrics and prescription quotas adopted by the National Retail Pharmacies for their retail stores contributed to their failure. For instance, under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. The result is both deeply troubling and entirely predictable; Opioids flowed out of National Retail Pharmacies and into communities throughout the country. The policies remained in place even as the epidemic raged.

381. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that this problem was compounded by the National Retail Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is needed for a condition for which the FDA

has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills are supplied for the purpose of illegal diversion and drug trafficking.

382. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that the National Retail Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

383. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that the National Retail Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

384. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that the National Retail Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly; if they conducted such audits, they failed to take any meaningful action as a result.

385. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that the National Retail Pharmacies also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling

of opioid prescriptions.

386. The National Retail Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable and in many areas patently absurd; Yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

387. The National Retail Pharmacies have long been on notice of their failure to abide by the laws and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the National Retail Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and practices of the National Retail Pharmacies.

388. Each National Retail Pharmacy Defendant has distributed excessive amounts of prescription opioids. In addition to the misconduct outlined above, Plaintiffs state the following:

**CVS**

389. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed pharmacy and wholesale distributor. CVS also operates retail stores that sell prescription medicines, including opioids.

390. At all times relevant to this Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States.

391. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations.

392. CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

393. As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.

394. This fine was preceded by numerous others throughout the country.

395. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008 to 2012, CVS stores and pharmacists in Maryland violated their duties under the CSA by filling prescriptions with no legitimate medical purpose.

396. In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut had failed to maintain proper records in accordance with the CSA.

397. In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

398. In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances — mostly addictive pain killers — more than 500 times between 2011 and 2014.

399. In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's

Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.

400. In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

401. In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations that it filled prescriptions written by a doctor whose controlled-substance registration had expired.

402. In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

403. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

404. CVS has had knowledge and/or notice of the opioid problem since at least 2002.

405. At any time since CVS had knowledge and/or notice of the opioid problem, it could

have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

406. In their capacity as wholesale distributors, CVS and its subsidiaries are National Retail Pharmacy Defendants, and all alleged allegations against the National Retail Pharmacy Defendants herein apply equally to CVS.

**Rite Aid**

407. Rite Aid conducts business as a licensed pharmacy and wholesale distributor. Rite Aid also operates retail stores that sell prescription medicines, including opioids.

408. At all times relevant to this Complaint, Rite Aid distributed prescription opioids and engaged in the retail selling of opioids throughout the United States.

409. With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is the third-largest drug store chain in the United States, with annual revenue of more than $21 billion.

410. In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties.

**Walgreens**

411. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed pharmacy and wholesale distributor. Walgreens also operates retail stores that sell prescription medicines, including opioids.

412. At all times relevant to this Complaint, Walgreens distributed prescription opioids and engaged in the retail selling of opioids throughout the United States.

413. Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in

fiscal year 2017.

414. Walgreens has also been penalized for serious flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history — $80 million — to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription opioids to be diverted for abuse and illegal black market sales.

415. The settlement resolved investigations into and allegations of the CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

416. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 — more than ten times the average amount.

417. Walgreens increased their orders over time, in some cases as much as 600% in the space of just two years, including, e.g., supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet, Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions, perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.

418. Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to

Walgreens' Florida pharmacies and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

419. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

420. The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

421. In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

**Walmart**

422. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed pharmacy and wholesale distributor. Walmart also operates retail stores that sell prescription medicines, including opioids.

423. At all times relevant to this Complaint, Walmart distributed prescription opioids throughout the United States.

**Costco**

424. Costco conducts business as a licensed pharmacy and wholesale store. Costco also operates retail stores that sell prescription medicines, including opioids.

425. At all times relevant to this Complaint, Costco distributed prescription opioids throughout the United States.

426. Costco failed to track and report suspicious sales of its opioid drugs.

427. Costco could and should have taken action that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate- release formulations of opioids before extended-release opioids are dispensed.

428. Having knowledge and/or notice of the damages that Costco's conduct had caused to Plaintiffs, Costco failed to take other steps to help curb the damages already incurred by Plaintiffs.

429. National Retail Pharmacy Defendants could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and

(h) required the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

430. Costco could have and should have implemented these measures at any point in the last 20 years.

431. The failure to take such steps that Costco should have taken was negligent and did result in significant damages to Plaintiffs.

## DISCOVERY RULE AND TOLLING

432. The Defendants' unfair and deceptive conduct was well concealed, and only recently uncovered through exhaustive investigation and research. The Defendants deliberately conducted much of their deception through in-person sales visits, in order to avoid generating a potentially discoverable paper trail of their misconduct. The Defendants also concealed from the general public their internal communications about their deceptive course of conduct, including their plans to hook more patients on higher doses for longer periods and, separately, their knowledge of inappropriate prescribing by high-prescribing doctors that they had targeted to prescribe their opioids.

433. Discovering the nature and extent of the Defendants' unfair and deceptive conduct has been a time-consuming and complex process, further strained by Defendants' lack of cooperation and baseless denials. Due to Defendants' deception, any statutes of limitation otherwise applicable to any claims asserted herein against all Defendants have been tolled by the discovery rule and rules regarding fraudulent concealment.

## COUNT I
## RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961 et seq.

434. Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

435. Defendants conducted and continue to conduct their business through illegitimate means in an association-in-fact enterprise and/or legal entity enterprise.

436. Defendants are persons under 18 U.S.C. § 1961(3) because they are entities holding a legal or beneficial interest in property.

437. Defendants have aggressively sought to increase and generate profits from the prescription opioid market by unlawfully increasing the volume of opioids manufactured, distributed, and sold.

438. As registrants under the CSA, Defendants are not permitted to limitlessly expand the opioid market through unlawful sales of regulated prescription opioids.

439. The CSA restricts and regulates Defendants' ability to manufacture and distribute prescription opioids, requiring Defendants to maintain effective preventative measures against opioid diversion, including, but not limited to: monitoring and identifying suspicious orders, preventing suspicious orders from being filled, reporting suspicious orders to the DEA, and to not exceed sales quotas established by the DEA.

440. These precautionary methods created by the CSA were intentionally established to reduce or eliminate the potential for opioid diversion.

441. The Defendants found it impossible to maximize profits within the legal framework of the CSA. Choosing illegal profits over the law, Defendants systematically and fraudulently violated their statutory duties of maintaining effective anti-diversion measures through the intentional failure to report suspicious orders and the repeated unlawful sales of prescription opioids. As a result, Defendants illegally increased annual production quotas for prescription opioids.

442. The term "enterprise" is defined as "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The definition of "enterprise" in § 1961(4) includes both legitimate and illegitimate enterprises.

443. Defendants forged an association-in-fact enterprise to perpetuate their illegal scheme of illegally increasing the production of prescription opioids (collectively referred to as the "Opioid Diversion Enterprise"). In concert and through the Opioid Diversion Enterprise, Defendants participated in an illegal scheme, the purpose of which was to engage in the unlawful sale of prescription opioids while deceiving the public and regulators into believing that Defendants were faithfully complying with their statutory obligations. The Opioid Diversion Enterprise enabled Defendants to profit billions of dollars in the unlawful sale of opioids. As a direct result of Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, Defendants were able to extract billions of dollars in profit from millions of addicted Americans.

444. Defendants formed an additional association-in-fact enterprise to unlawfully market the safety and efficacy of prescription opioids (collectively referred to as the "Opioids Promotion Enterprise"). The Opioids Promotion Enterprise is comprised of Defendants, including their employees and agents; Front Groups, including their employees and agents; and KOLs; as well as external and other as yet unknown marketing firms and distribution agents employed by Defendants in furtherance of the Opioids Promotion Enterprise. All entities are persons within the meaning of 18 U.S.C. § 1961(3) and acted to enable Defendants to fraudulently market opioids as scientifically proven as safe and effective.

445. The Opioids Promotion Enterprise is an organization that functioned as an ongoing organization and continuing unit. The Opioids Promotion Enterprise was created and organized to

effectuate a pattern of racketeering activity and maintained systematic links for a common purpose: to ensure the continued prescription of opioids for chronic pain. Each of these entities, including the Defendants, is a "person" distinct from the Opioids Promotion Enterprise.

446. The Opioids Promotion Enterprise and Opioids Diversion Enterprise scheme empowered Defendants to make billions in unlawful sales of opioids and, in turn, increase and maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the Defendants' fraudulent schemes, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue, while Child S.J.S. suffered injury caused by the reasonably foreseeable consequences of the opioid epidemic. Child S.J.S. is entitled to treble damages for his injuries under 18 U.S.C § 1964(c).

447. Members of the Opioid Diversion Enterprise systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders. As alleged herein, through the Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers, which in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA. In doing to, the Defendants allowed hundreds of millions of pills to enter the illicit market, which allowed them to generate enormous profits.

448. Alternatively, Defendants were also members of a legal entity enterprise. The Healthcare Distribution Alliance ("HDA") is a distinct legal entity that qualifies as an enterprise under 18 U.S.C. § 1961(4). The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia.

449. The Defendants utilized the HDA to conduct a RICO enterprise and to engage in the pattern of racketeering activity that gives rise to the RICO Count.

450. Each of the Defendants is a legal entity separate and distinct from the HDA, and the HDA serves the interests of distributors and manufacturers beyond the Defendants.

451. Therefore, the HDA exists separately from the Opioid Diversion Enterprise and the Opioid Promotion Enterprise and each of the Defendants exists separately from the HDA. Therefore, the HDA itself serves as a RICO enterprise.

452. The association-in-fact enterprises (Opioid Promotion Enterprise and Opioid Diversion Enterprise) and the HDA were each used by the Defendants to engage in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises are collectively referred to as the "RICO Enterprise."

453. It is unlawful for a CSA registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by the DEA, or (2) in excess of a quota assigned to it by the DEA.

454. At all relevant times, the Defendants operated as an enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits by disregarding their statutory duty to identify investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

455. At all relevant times, the RICO Enterprise: (a) existed separately and distinctly from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the

Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Defendants; (d) characterized by interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the RICO Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astonishing growth of profits supplied by fraudulently inflating opioid sales generated as a result of the RICO Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the Defendants would have a larger pool of prescription opioids from which to profit.

456. The RICO Enterprise also engaged in efforts to lobby against the DEA's authority to hold the Defendants liable for disregarding their duty to prevent diversion.

457. Members of the HDA lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations. The HDA contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees, and political parties.

458. The RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across state lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the United States and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

459. The Defendants colluded to ensure that the quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious

orders or diversion of prescription opioids, the Defendants ensured that the DEA had no basis for decreasing or refusing the increase the production quotas in the following ways:

a. The Distributors assisted the enterprise and the Manufacturers int heir lobbying efforts through the HDA;

b. The Distributors invited the participation, oversight, and control of the Manufacturers by including them in the HDA, including on the councils, committees, task forces, and working groups;

c. The Distributors provided sales information to the Manufacturers regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributors;

d. The Manufacturers used a chargeback program to ensure delivery of the Distributors' sales information;

e. The Distributors accepted rebates and chargebacks for orders of prescription opioids;

f. The Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

g. The Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributors by the DEA for failure to report suspicious orders;

h. The Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

i. The scheme devised and implemented by the Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

460. Defendants took intentional and affirmative steps to conceal the RICO scheme through the use of unbranded advertisements, third parties, and Front Groups to disguise the source of the Defendants' fraudulent statements.

461. Each time a participant in the illegal RICO scheme distributed a false statement by mail or wire, it committed a separate act of mail fraud or wire fraud under federal law, thereby demonstrating a pattern of racketeering activity.

462. Defendants used and caused to be used thousands of interstate mail and wire communications through uniform misrepresentations, concealments, and material omissions regarding the safety and efficacy of opioids and their compliance with the CSA's anti-diversion statutes. The Defendants committed this pattern of racketeering activity on a continual and regular basis with the intent to advance the illegal scheme of the RICO Enterprise.

463. Defendants also engaged in a pattern of racketeering activity in the unlawful manufacture, distribution, and sale of prescription opioids, a controlled substance under the CSA. Defendants routinely and intentionally furnished false, misleading, or incomplete information in their reports to the DEA and their applications for production quotas.

464. Child S.J.S. has injuries that were directly caused by the Defendants' racketeering activities.

465. Child S.J.S. was most directly harmed and there are no other entities better suited to seek a remedy for the economic harms at issue here.

466. Plaintiffs seek all legal and equitable relief as allowed by law, including actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT II - CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

467. Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

468. All Defendants acted in concert to mislead medical professionals, patients, the

scientific community, the CDC, the FDA, the DEA and the general public about the addictive nature of opioids and the risk of serious latent disease associated with in utero exposure to opioids so that their profits would increase.

469. The Manufacturer Defendants continuously supplied prescription opioids to the Distributor Defendants despite having actual or constructive knowledge that said Distributors were habitually breaching their common law duties and violating the CSA. The Distributor Defendants continuously supplied prescription opioids to pharmacies despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating the CSA.

470. Without the Distributor Defendants' supply of prescription opioids, pharmacies would not be able to fill and dispense the increasing number of prescription opioids nationwide.

471. No Defendant in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

472. The Manufacturer Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Manufacturer Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Manufacturer Defendants ignored the warning signs of opioid diversion.

473. This court has found that there is a genuine issue of material fact as to whether the Manufacturer Defendants had an agreement to commit an unlawful act, among themselves or with other Defendants, in order to expand the market for prescription opioids and whether the Distributor Defendants shared a general conspiratorial objective with themselves and other Defendants to expand the opioid market and disregard regulatory obligations in order to achieve

that goal. *See* Order Regarding Defendants' Summary Judgement Motions on Civil Conspiracy Claims, Case 1:17-md-02804-DAP, Doc #2562, Filed 09/03/2019.

474. As a result of the concerted actions between and among the Defendants, Plaintiffs have suffered damages.

**COUNT III- NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

475. Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

476. Defendants owe a non-delegable duty to Plaintiffs to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

477. There is no social value to Defendants' challenged behavior. In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

478. On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of Plaintiffs.

479. Defendants' behavior caused a substantial injury and damage to Plaintiffs.

480. Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

a. Consciously supplying the market nationwide with highly addictive prescription opioids, including misrepresenting, understating, or obfuscating the highly addictive propensities of opioid pills

b. Using unsafe marketing, labeling, distribution, and dispensing practices, including failing to warn or advise physicians to conduct an addiction family history of each and every potential patient;

c. Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d. Failing to properly train or investigate their employees;

e. Failing to properly review and analyze prescription orders and data for red flags;

f. Failing to report suspicious orders or refuse to fill them;

g. Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

h. Failing to police the integrity of their supply chains; and

i. Creating misleading information with the intention of having prescribing physicians rely upon it.

481. Each Defendant had an ability to control the opioids at a time when it knew or should have known it was passing control of the opioids to an actor further down in the supply chain that was incompetent or acting illegally and should not be entrusted with the opioids.

482. Each Defendant sold prescription opioids in the supply chain knowing (a) there was a substantial likelihood many of the sales were for non-medical purposes and, (b) opioids are an inherently dangerous product when used for non-medical purposes, and (c) that every patient, before being prescribed even one opioid pill, needed to have a complete family history of addiction to alcohol and drugs, with any such history as a contraindication of any opioid use.

483. Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

484. Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

485. Defendants were also negligent or reckless in failing to guard against foreseeable third-party misconduct (e.g., the foreseeable conduct of corrupt prescribers, corrupt pharmacists

and staff, and/or criminals who buy and sell opioids for non-medical purposes).

486. Defendants are in a limited class of registrants authorized to legally distribute controlled substances. This places Defendants in a position of great trust and responsibility vis-a-vis Plaintiffs. Defendants owe a special duty to Plaintiffs. That duty cannot be delegated to another party.

487. Plaintiffs are without fault, and the injuries to Plaintiffs would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

488. The aforementioned conduct of Defendants proximately caused damage to Plaintiffs.

**COUNT IV – GROSS NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

489. Plaintiffs reassert each and every allegation set forth in all preceding paragraphs as if fully restated herein.

490. The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants.

491. Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

492. Defendants realized the imminence of danger to Plaintiffs and other members of the public, but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

493. As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminal indifference to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

494. Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. An award of punitive and exemplary damages is therefore necessary to punish Defendants and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages.

495. The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

## PRAYER FOR RELIEF

496. WHEREFORE, Plaintiffs, Beth Vincent, individually and as next of friend and guardian of Child S.J.S., request that the Court grant the following relief:

a. Individual Compensatory and Punitive damages for physical and mental pain and suffering (past and future);

b. Medical expenses (past and future)

c. Lost wages (past and future)

d. Loss of enjoyment of life (hedonic damages);

e. All other damages awarded at law or in equity;

f. Attorneys' fees and costs;

g. Pre- and Post-judgment interest;

h. All such other relief this Court deems just and fair; and

i. Plaintiffs seek a trial by jury for all counts so triable.

Dated: December 15, 2021

Respectfully submitted,

*/s/W. Wylie Blair*
James G. Onder #38049
W. Wylie Blair #58196
Lawana S. Wichmann #53999
Angela N. Mozdzierz #039363
ONDER LAW, LLC
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
onder@onderlaw.com
blair@onderlaw.com
wichmann@onderlaw.com
mozdzierz@onderlaw.com